Morning after, well, let's, let's let current It's number 20-3493 from the District of Minnesota 301-712-2103 and 3151 at all versus City of Minneapolis at all May it please the Court, my name is Robert Hayes and I represent 43 separate either owners of property or managers of multi-tenant residential dwellings in the City of Minneapolis. And I, that, my clients include small entities, more corporate entities and a broad spectrum of those who rent property in the City of Minneapolis. And we are presently pending before the Court is the appeal from the denial of their motion for a preliminary injunction to enjoin the enforcement of the tenant assessment ordinance that was passed by the City of Minneapolis, by the City Council. And we challenge that ordinance in the grounds that it's a violation of the Takings Clause and is also a violation of the Fifth Amendment right of due process. The District Court denied the motion on the grounds that it was not reasonably likely we would establish a constitutional violation. I would submit to the Court that that decision is legal error, that is reviewed de novo by this Court and it should reverse that ruling. Both that we have established a substantial basis or a reasonable likelihood of establishing that the ordinance is unconstitutional. And as that is the real determination on a motion for a preliminary injunction in raising a constitutional issue, that that determination alone merits the reversal of the judge's decision. Counsel, has there been an injunction entered in any similar litigation, either in this circuit or across the country? Yes. Interestingly, there was a challenge to the St. Paul ordinance that was in the matter of the Lamplighter case. And that was also a case that was decided by the District Court below Judge Magnuson. Now, the St. Paul ordinance was certainly more onerous to owners, but we would submit to the Court that the principles are the same. And Judge Magnuson in that instance issued a preliminary injunction in joining the enforcement of that ordinance. But that's not an appeal any place you write? No, it's not, actually. The city ultimately determined to accept that determination. And I believe a judgment, I'm not directly involved in that case, but I believe a judgment was entered. And in fact, I think a motion, a voluntary judgment was entered and a motion for attorney's seizure is pending before the Court. So you have a case where the same judge has decided and entered a preliminary injunction. Okay. So that does sharpen the issue. St. Paul didn't have an individual assessment. And Minneapolis does have that individual assessment, which you know Judge Magnuson relied on. Is that enough to say that? No, it's not. And it's for a couple of reasons, Your Honor. And just predicate to answering your question directly, what the Supreme Court has decided, particularly in the Cedar Point case that we submitted as a supplemental authority, is that any impingement on the right to exclude implicates the Takens Clause. And in this instance, even if you believe that the individual assessment doesn't require you to accept any person, it is still a burden on the right to exclude. It dictates to the owners the methods and the procedures by which they must evaluate a tenant. It imposes in many ways onerous obligations and tells them, you will consider these factors. Regardless of the individual assessment, I believe the statute is plain that they cannot, for instance, look at a credit score. No matter how low that credit score is, they cannot consider that. So just on its face, it's imp— I thought they could under the individual assessment. I think on the individual— Didn't the trial court act like they could? I don't recall if the trial court specifically addressed that issue. But what I'm suggesting to the Court is that certainly, if, for instance, if you want to have more exclusive criteria for a criminal conviction, then you can conduct the individual assessment. But my reading on that one issue on the credit score is you can't consider it at all. That's my reading of the statute. Is it your view that if Judge Magnuson had the benefit of Cedar Point, his consideration of this case may have differed? I would think that he certainly did not have the benefit of Cedar Point and that it is a compelling case so that his, particularly in light of Lamplighter, his decision may be different in this case at this point in time. But the second point I would make on the individual assessment is I just don't — I would submit to the Court, you cannot read that ordinance, that provision of the ordinance, to say that you can nevertheless reject anybody you want as long as you do an individual assessment. It would, in a way, make the statute actually useless. And if you read it that way, to me, that's a substantive due process violation because what you're doing is burdening the landlords for no purpose because they have to go through this entire process and they can just say, no, reject it. I've got the Minneapolis ordinance in front of me. And boy, the way I read individual assessment, it could be any basis. So that could include credit. I'm in the D section of something. You have to tell me where D is. Of course, it says D, individualized assessment. Right. So it's not rocket science, I hope. 244.2030, and it's D, a landlord that applies screening criteria more prohibitive than includes credit history in the inclusive must conduct an individualized assessment on any basis. I think any basis includes credit. Tell me if I'm wrong. The first time I thought — I would direct the Court to — Okay. C2, which is credit history. Yeah, but that's what they're referring to when they say the inclusive screening criteria, because that's C. You follow what I'm trying to say? Go to D and look at the second line, at least in my copy. And I follow you, Your Honor, but what I'm submitting to you is I think that that applies to anything other than credit score, but I don't want to get hung up on that point because I think even though I'll grant you that for any provision you can have an individual assessment, you may consider it. To the extent that this ordinance requires you — here's four factors you have to consider. How long ago was the event? What would the age of the person was? And other factors that you must consider. Beyond that, you must consider, for instance, any evidence that the tenant determines to provide to you, any evidence in writing. So — and you must consider it. Consider means something. And I was thinking about it. If you, in terms of district courts, for instance, have discretion on a lot of issues, right, that doesn't mean they can do whatever they want. I mean, you have factors that you have to follow. You have to give them due consideration. And if you don't follow those factors, you, quote, abuse your discretion. And so what I'm suggesting here is that where you have all of these standards, everything you must do, and you're subject to up to criminal penalties if someone decides that you're wrong, that by definition, and even by practical consideration, if I'm an owner and I'm subject to criminal penalties, that's going to affect the way I review an assessment. It's going to make me at times accept someone for the tenancy that I don't want to be my tenant. And I feel, in those circumstances, it's increasing the risk of a bad behavior or a failure. Counsel, let me ask you another question. What about the sentence from ye that says, and I'm quoting the Supreme Court, the government may require the landowner to accept tenants he does not like without automatically having to pay compensation? The United States Supreme Court wrote that sentence. Justice Kagan's told us many times the best way to go about what they wrote. And so, help me why, at least for the Court of Appeals, that doesn't control the case, almost. I think that what controls for this Court is the Supreme Court's most recent pronouncement on that, which was a cedar point. But it didn't disown this sentence, right? They've never disowned that sentence I quoted you, correct? Well, I would submit to you, for instance, in Horn v. the Department of Agriculture, which we cite in our brief, I will summarize the quote, which is something along the line of that you cannot hold hostage normal and accepted use of property by requiring someone to relinquish a constitutional right. So that's the United States Supreme Court as well. Well, notice they put the word automatically in that sentence. So I think they're talking about a per se taking as opposed to the regulatory pin central factors. Well, I know, but I would submit to you, I think if a cedar point establishes anything, is that when you are impinging, you know, requiring access to property, impinging the right to exclude, it doesn't matter anymore whether it's you want to call it regulatory or if you want to call it some other type of statute. If it impinges the right to exclude, then it implicates the takings clause. Are we still supposed to use central factors or not after a cedar point? I would submit in this where you look at where it is clear that the right to exclude is implicated. You do not have to go to cedar. You don't have to. Does it matter that that case involved union activity on company ground versus a tenant-landlord-residential relationship? I think that in our case, it's a stronger or a more significant violation of the rights. This was a very short duration, in and out for four hours or whatever. Here, you're talking about a tenancy that's a devise of real estate, right? Right in real estate. You surrender possession of the property. And under the law, once you do that, the tenant has a superior right to possess the property even over the owner. So that's a very significant impingement on the ownership interest. And so for that reason, I would submit to this Court that if you presented our case even to the dissent in cedar point, the dissent would say, this is a taking. Because they're in the dissents talking about really, you know, they considered that case to be a very tangential regulation of the use. But it did say if it imposes on the rights to exclude in any kind of significant way, even the dissent would recognize that's a taking. So I would submit. But the landlord's rights are not unfettered, even under existing law. Can't not rent to someone on the basis of a number of prohibited categories. So I would submit that I'm not, I would, if you, for instance, read the long dissertation of all the statutes that the amici submitted in support of the city, you will not find other than perhaps, for instance, you know, the Federal Housing Development Act that puts incidental limitation on the right to rent. But I would submit, no, that you really, there's a substantial difference, for instance, saying that, you know, you have to put smoke alarms in accordance with code. Because that's the use and it's protecting. It's dealing with this. And in my 12 seconds that's left here, I'll just try to leave the Court with the concept that this really is social welfare legislation, where they're imposing the burdens of what the council thought was necessary to help on one small segment. And the Supreme Court has repeatedly said, Your Honor, that is a taking. Thank you. Thank you, Mr. Hayes. Mr. Carter? I'm sorry. You'd think I'd have the hang of this after a couple of days, but still getting used to our hygiene procedures. Thank you, counsel, for your patience. Mr. Carter? Good morning, Your Honors, counsel. May it please the Court. I want to start out maybe with just talking a little bit about the individualized assessment. I think the Court is understanding the ordinance correctly. If a landlord decides to do the individualized assessment, they can look at any criteria they want, as long as it's not illegal under, say, the Federal Fair Housing Act. Like, you can't look at race. You can't look at a person's disability. But aside from that, under the individualized assessment, the landlord is free to look at any criteria, credit score, criminal history, eviction history, anything. Now, there are some additional hoops to jump through. You have to invite the applicant at the time of application to give any supplemental evidence. You have to look at that supplemental evidence. You have to look at things like, perhaps, how long ago the criminal conviction was, that kind of thing. After all those boxes are checked, the landlord has discretion to pick whatever applicant he or she wants. And that's why this is not an infringement on the landlord's ability to exclude an applicant from his or her property. Counsel, you agree there's cost put on the landlord, right? Yes. There is a cost. Now, the record does not establish what that cost is. The record doesn't establish whether it's an extra $300 per applicant or an extra 3 cents per applicant. That's more than 3 cents to keep these records and send them in and do all this stuff. Fair enough. Yes. And the plaintiff has not, has basically conceded that economic issue in their brief, that that's not something they're arguing before the court. Would the statute permit, or excuse me, the ordinance permit landlords to request an application fee? I don't recall. I don't, off the top of my head, I don't recall any prohibition on application fee, but I don't remember that issue enough. I would have to look it up. So I apologize, Your Honor. I don't know the answer to that one. Is there another ordinance that prohibits that? No. I'm not aware of an ordinance that prohibits that, but I haven't looked that up. Feel free to write us a 28J letter if there is such an ordinance. Okay. I will take a, let me take a look and I'll note that. So that's the basic point. And much of the takings argument relies on the theory, the claim that the ordinance prohibits the landlord from excluding a particular tenant. That's not the case, and the takings argument fails on that point. What about the inclusion of potential criminal penalties for the sufficiency of the investigation? I don't think there's anything concerning about that. The numerous ordinances include criminal provisions if you violate an ordinance. The City is well within its authority to make it a criminal penalty to violate an ordinance. And what we're talking about here is not a check on the landlord's discretion. We're talking about a criminal penalty if they violate the procedures that are demanded by the ordinance, right? So if they don't do an individualized assessment, but they ignore the requirement that they have to use the inclusive screening criteria and say they look at credit score, okay, that's a violation of the process. This ordinance is a control on the tenant screening process. It's a regulation of the tenant screening process. And what's your view of Cedar Point and whether that creates a barrier to being able to impose the type of restriction that you have designed into this ordinance? Cedar Point is not controlling in this case. Is it informative? No, except for the fact that Cedar Point left Yee v. Enscondido as good law, and it left Pruneyard as good law. And those two Supreme Court cases still stand after Cedar Point Nursery, and they're the ones that are binding to this Court on this particular per se takings issue. So I'll back up a minute to explain my reasoning on that point. Okay. So first of all, Cedar Point is a per se takings case, all right? And that is the argument that the plaintiffs have basically put before the district court and before this court is that this ordinance is a per se takings. So Nolan and Dolan, which have to do with conditioning a permit or a variance on an exaction, that's not what we're talking about. Nolan and Dolan and how they distinguish various other takings cases, that's not applicable here. That's not applicable to the question of whether Yee and Pruneyard are still good law. Penn Central, that's our standard regulatory takings case. They make no — they — plaintiffs admit that there's no showing of an interference with the economic — excuse me, investment-backed economic expectations. So under that, we don't have a likelihood of success on Penn Central. In fact, that argument wasn't really even briefed before the district court. So that's not the case here. So what are we left with? We're left with a per se takings. And under Cedar Point, the court was very careful — Justice Roberts was very careful to distinguish Pruneyard. And Pruneyard involved a property that was open to the public because it was a shopping center. And the California statute required those shopping center owners to allow people to access the property for First Amendment purposes and for petitioning purposes, regardless of whether the owner wanted to exclude them. It was a clear interference with the ability to exclude. Now, Cedar Point and Pruneyard, the court held that that was not a per se takings. And Cedar Point was careful to distinguish Pruneyard and keep it good law by saying in the Cedar Point case, we're dealing with private agricultural land that is not open to the public. So that was what Justice Roberts very carefully used, that fact, not open to the public. He used that to limit the scope of Cedar Point. Now, Yee v. Enscondido wasn't open to the public in terms of the shopping center, but was open to the public in terms of a landlord-tenant relationship. And that case also still stands after Cedar Point. And plaintiffs make the argument in their reply brief that Yee did not address the question of whether an interference with a landlord's ability to exclude a tenant is a per se takings. Well, that is definitely one of the things that Yee addressed, and Justice O'Connor addressed it in her opinion, 503 U.S. at 553 to 531, where it determined that, quote, excuse me, I'm going to get the quote exactly right. Yee determined that the ordinance's interference in combination with the state statute that interference with a landlord's ability to choose his or her tenant was, quote, not a per se takings. And it specifically said that the fact that it interferes with that right to exclude the incoming tenant does not make it a per se takings. Is that the Yee case you're referring to? That's the Yee case. And the site is at 530 to 531. There's one paragraph there where Justice O'Connor addresses this very issue and the argument that was — that argument that was presented by the plaintiffs in that case. And she goes on to say, the Court goes on to say, because Petitioners, as landlords, opened their property up to the public, there is no per se takings based on their inability to exclude the particular individual. I believe that's the quote that Judge Benton recited earlier. That is still good law. How do we know that's still good law, that sentence? It also has automatically, as you know, in it. But how do we know it's still good law? Because — Has the Supreme Court quoted it again? No, right? Supreme Court cited Yee. Has the Supreme Court quoted that sentence? I'm asking too many questions at the same time. I do not know whether the Supreme Court has quoted that sentence in Yee. The Supreme Court in Cedar Point cited Yee, did not say that it was bad law, did not indicate that it was bad law. It did criticize some of the language in Yee, but it did not say that the holding in Yee was — was — was no longer valid. And, you know, under the — you know, under the rules of stare decisis, the — the holding is that when you have property that's not open to the public, private property, no — they also made the point in Cedar Point that nobody — none of the workers actually lived on the property. So there's no landlord-tenant relationship. So Yee was not — Yee is distinguishable from Cedar Point. The Supreme Court did not indicate that it was no longer good law. It is still binding on this Court. Now, I think there's a fair argument that if you look at the way the Court is moving after Cedar Point, perhaps the Court might be inclined to revisit Yee, but it has not done so. Are there any other cases addressing similar fair chance ordinances that are percolating in the Federal circuits? That — I'm not aware of any in Federal courts. The City of Portland and the City of Seattle had similar ordinances. They're actually more onerous than Minneapolis's. For example, they have a first-in-time requirement where you can't spread out all the applications. You have to look at them in the order that they come. Both of those ordinances were upheld as constitutional by the State courts. But I'm not aware of — They go to a State court of last resort, a Supreme Court of a State. Go ahead. In Washington, yes. Okay. In Oregon, I'm not. I don't recall. Just looking at it, Cedar Point, does it even cite Penn Central? I don't know. I don't recall. But you agree there's a regulatory taking here. In — In this very case, in 301-712, this very case. I do — I — there is a regulatory taking argument to be made based on the facts that have yet to be established. For example, what is the economic burden on the plaintiffs? We — that is not something that was developed factually. But if they had a lot of costs, it's got to be a regulatory taking, right? It depends on the balance of the factors. So you're back to Penn Central, saying Penn Central applies. That and Penn Central, yes. But I think the district court was clear that they did not show a likelihood of success on the merits under Penn Central. In fact, they didn't even brief it in their opening brief before the district court. And that — that was not error. That was the correct decision. I do want to talk a little bit about the — whether we're dealing with a fundamental right here. And I think there's much that plaintiff has said about what the actual right is. But if you look on page 21 of their reply brief, they pretty much clearly state what right we're dealing with. And it is, quote, whether every landlord is entitled to apply screening criteria as it deems appropriate. So that's the right we're talking about, is their right to screen rental applicants as they see fit without regulation. Obviously, there's regulations that apply outside of the ordinance. Federal Fair Housing Act says you can't do it on race or disability. This is a different kind of regulation in that it has further requirements on the screening process. Well, the amicus say it's the right to exclude unwarranted tenants. So what do you say to that as a fundamental right? I don't think that that's the right we're dealing with, because it's the individualized assessment, that they have discretion to decide who they want. But moreover, I don't think even that characterization is not a fundamental right. And if the Court looks at Pruneyard, which deals with the right to exclude a period, pretty much, the Supreme Court applied a rational basis test. Scalia, if I could ask a question. The Chief asked the question a few minutes ago about is this ordinance based upon others, and you said that it is based upon others. And what does the empirical evidence show in those cases? Are any of these qualifications empirically based? I mean, you said at the outset you can ask any question you want, but in the real world, that's not how this is going to work out. And you know it better than I do. And I guess your answer to that is let's see how it plays out. And besides, if it costs the landlords their livelihood, so be it. I'm not sure I fully understand the question. I am not — Well, for example, number 16, sociological research does not support the idea that criminal record has anything to do with a person's creditworthiness. Well, okay, if you're a landowner, then you can't take that into account. The — I'm not — I'm not familiar enough with the legislative record of the other ordinances to state what empirical evidence they relied on. With regard to this case, I think the district court looked at the legislative record and made those factual determinations. Okay. And that's why, you know, the standard of review comes in here. These are factual determinations made by the district court. So it's now the de novo review of that. Oh, I see. But I think that the district court's reasoning on that rational basis calculus, which is a very low standard, not a question of whether the policy is wise or the best choice, but I think the district court's analysis on that was clearly correct and should be affirmed. Thank you, Your Honor. Thank you, Mr. Carter. In Cedar Point, the Supreme Court confined Pruneyard to its facts, which involved a shopping center that admitted 25,000 people a day, and the issue there was more what activity could go on once they were — they were admitted. To the extent that the Yee case was a 1992 decision, and in that case, there was not  found that the argument that there was a per se taking was waived because the statute that they were really looking at was the rent control, not the statute adjusting the right to rent to whomever you want. And beyond that, even if you're going to say that that's what that case stood for, in 1994 in the city of Triguard, the Supreme Court held that the mere fact that a property was open to the public was not a basis to find that a limitation or a taking of that property was acceptable, that the court said you cannot do it in that way. The district court applied on the substantive due process claim a rational basis standard of review, so it did not even look at strict scrutiny. And if you look — I can't within the timeframe, but if you look at our briefs, Your Honor, we go through the real flaws in the science or the studies on which they rely. For instance, under this statute, basically the way it reads versus how long sentencing are, people would be entitled immediately coming out of jail to be accepted. And the literature on which they rely says that's the time that they're most likely to be a recidivist. And so in here or in any — in Portland and in Washington, there's no scientific basis for what they're saying here. There really is no attempt to say, and this really goes to the substantive due process, that the people that we now say you have to accept, they're going to be reasonably likely to be good tenants, and the ones we're now excluding are not. And that's the fundamental flaw which makes it over-inclusive and under-inclusive on a substantive due process basis, because you're not making that determination. And there's so many arbitrary distinctions in the statute, it just does not pass strict scrutiny. And I would just reiterate that the district court in the Lamplighter case, and I don't think it's any different, even though it's more onerous to the St. Paul statute, applied a strict scrutiny analysis. And we are alleging the same— Which case applied strict scrutiny? Which case did you say applied strict scrutiny? The Lamplighter case, the St. Paul ordinance. And that case was decided after our principal brief was submitted, so it's addressed in our reply. And we go in line to STA. The cases in Portland and Seattle, to my understanding, are still ongoing. I think certain issues have been decided against the plaintiffs, but none are raising a takings claim. And I don't believe any are — and I may be wrong on this, so I shouldn't say it, but I don't believe that there's a substantive due process claim there, too. So unless there's any other questions for the Court, I thank you very much. Roberts. Thank you, Mr. Hayes. Thank you also, Mr. Carter. The Court appreciates both counsel's excellent arguments to us this morning. You've been very helpful in what is a difficult case. We will continue to review the briefing and take the case under advisement. Thank you. Counsel may be excused.